## Appeal of H. B. GRAVES COMPANY, INC.   Docket No. 619.

The Board is without authority to require the Commissioner to permit the filing of returns and the computation of income and profits taxes, under the provisions of article 42 of Regulations 45, since such returns, if filed, would not "clearly reflect the income" of the taxpayer and the method of computing income provided in that article does not conform to section 200 of the Revenue Act of 1918. *Appeal of B. B. Todd, Inc.*, 1 B. T. A. 762, cited and approved.

Submitted March 9, 1925; decided March 23, 1925.

*R. E. Glessner* and *L. F. Cooper, Esqs.*, for the taxpayer.

*A. H. Fast* and *George E. Adams, Esqs.*, for the Commissioner.

Before IVINS, KORNER, and MARQUETTE.

### FINDINGS OF FACT.

1. The taxpayer is a New York corporation organized in the year 1914. It was the successor of an incorporated company of the same name which was organized in the year 1889. The taxpayer is engaged, and has so been engaged since 1889, in the sale of house furnishings on the basis of, (a) cash sales, (b) credit sales, and (c) installment-plan sales.

2. The goods sold on the installment plan remained the property of the taxpayer by the terms of its installment sale contract. Upon failure of the purchaser to pay any of the agreed payments, the H. B. Graves Company, Inc., may enter into or upon the premises wherever the goods may be and resume actual possession, and any payments theretofore made shall be considered for the use thereof. This is in accordance with the agreement entered into at the time of the sale between the purchaser and the taxpayer. In 1918 the installment sales, after allowing for returns and allowances, were in the amount of $296,082.51; the total of delivery or initial payments on these sales was in the amount of $59,459.61, being 20 per cent of the amount of the net installment sales; the net amount of the installment sales equaled 52.6 per cent of the total net sales; the ratio of delivery payments to the gross amount of installment sales, $317,957.54, as originally entered on the books without deduction for subsequent credits of merchandise returned and allowances, was 18.7 per cent. For many years records have been maintained of the several kinds or classes of sales.

3. The system of recording sales was as follows: At the time of making sale the sales person made a record of the sale on triplicate copies by use of carbon copies; a duplicate for office use and the

original copy for the shipping department were turned in to the office. If sales slips were accompanied by cash, they went at once to the first assistant of the general cashier. If sales slips were accompanied by a request for credit they went immediately to the credit manager. If credit request was for a ledger charge to be paid within 30 or 60 days, the sales slips O. K.'d for such a charge were passed on to the office. If the credit requested was for a deferred payment, lease or contract account (these all being installment sales) the credit was O. K.'d and the sale written up on a contract form made in duplicate. This contract was signed by the purchaser and witnessed in the office. The purchaser received the duplicate copy with the first or delivery payment endorsed on the back, while the original, with the sales slips, went to the cashier. This method applied to all sales, except petty cash sales, where the goods were taken by the purchaser, and the sales entered in duplicate on an ordinary sales slip, one copy going to the purchaser and one copy with the cash to the cashier. The assistant cashier turned over all sales slips to a bookkeeper to be entered in a classified record of daily sales which gave a record of sales for each sales person, classified as to cash sales, open charge accounts, and installment sales. This record also showed the total amount of cash received on all cash sales and the amount of delivery or initial payments on installment sales. This record was compared with the assistant cashier's record of cash received for cash sales, delivery or initial payments on installment sales, before such amounts were entered in the cash book. This daily sales record was also posted to a daily journal, a weekly summary of which was transferred to the sales and collection journal. ' The sales and collection journal, therefore, showed the weekly, quarterly, and yearly total of all sales and collection transactions under the following headings: Cash and charge sales, installment sales, installment sales collections, delivery or initial payments on installment sales, and the total cash received, which included charge accounts. The original entries for all these classifications, with the exception of collections that were posted from cash book entries, were from the daily sales record. The quarterly summary as to cash and charge sales and installment sales was compared each quarter with the corresponding entries in the general ledger to prove the accuracy of all posting from the general columnar cash book and journal, which entries were made from the cash book. This cash book reflected in a special column all cash received from the installment sales entered as follows: (1) Delivery payments as shown by cashier verified by sales analysis record, (2) collections from lease cashier, (3) collections from collectors. Another special column reflected all payments received on charge ledger accounts. The totals of these special columns were posted to the general ledger account at the end of each month. In the journal similar special columns were employed for the monthly postings of all charge ledger and installment sales. In the lease accounts receivable column appear all contract sales and the advance charge to make the time price. In the special column for charge accounts receivable appear all sales made on open charge accounts.

4. The general ledger contained the following accounts reflecting all transactions of installment sales or sales made on contract: (1) General control account of lease sales, showing charges and advances

on lease or installment sales and also credits of merchandise returned, delivery payments, and collections; (2) Lease refunds, showing refunds of payments made on contract accounts; (3) Advances on leases, showing the advances to lease accounts for time price; (4) Lease-advance rebates, showing advances discounted for payment in accordance with the provisions of the contract; (5) Surplus account. This account reflected the net profits on all sales for the year, and from this account were eliminated the unrealized profits on the installment sales for 1918 and credited to an unrealized-profits account.

5. The classification of credit accounts under open-ledger charges and installment sales was kept separate and distinct. The open-ledger accounts, or credit accounts, and the journal entries of charges and credits were in books used only for this class of accounts. Cash paid on these accounts was received at a particular window and by a cashier who does not receive any payments on installment-sales accounts. Journals and ledgers were kept by a bookkeeper who did not have any work on the journals and ledgers for the separate division of installment-sales accounts. All payments on installment-sales accounts were made at a window and to a cashier who received no other cash. This lease cashier made a daily written report to the general cashier of all cash received on installment-sales accounts. The general cashier made corresponding entries in the columnar cash book, monthly totals of which were posted to the general ledger-controlling account. The customers' ledgers for the installment-sales accounts were kept by bookkeepers who did not have any work in connection with the charge-ledger accounts. The charge-ledger or credit accounts were reported as completed transactions for the purpose of the income tax.

6. The allocation of collections on installment sales to the year to which the collection applied was made by the cashier at the time the payment was received. If the customer presented his contract at the time payment was made, the cashier made a note of the contract number, the name, and the amount of the payment. If the customer failed to present his contract when making payment, the cashier obtained the necessary information from an index and the payment was allocated to its proper year by the cashier at the time the payment was received.

7. At the close of the year an inventory was made of all installment-sales accounts. The difference between the balance as at the beginning and end of the year for each year's installment sales represented collections, and the percentage of profit applied thereto furnished the realized profit on such collections, while the percentage of profit applied to the balance as at the end of the year furnished the unrealized profit.

8. The books of the taxpayer were not finally closed into the general ledger on the basis of the installment system at the end of the year 1918, but the books of original entry were sufficient to permit of a segregation of the installment branch of the business. That is to say, no completed system of installment accountancy was maintained in the sense that an unrealized-profits account was set up, yet from the books, as they were kept, it was possible with accuracy to ascertain and set up the amount of unrealized gross profit repre-

sented in the uncollected installment accounts. However, to ascertain these unrealized profits on installment sales it was necessary to go through the books of original entry and construct such account therefrom. This was done subsequent to the filing of taxpayer's return on June 15, 1919, but before the filing of the returns upon which it now demands that the Commissioner compute its taxable income.

9. The taxpayer secured an extension of time for filing its return for 1918, and on June 15, 1919, a return was filed by it. This return was not prepared as on an installment-sales basis but was prepared on the basis of completed sales. The taxpayer had in prior years prepared and filed its returns on the latter basis. Thereafter, between the dates of June 15, 1919, and August 8, 1919, the taxpayer sought counsel of a leading firm of accountants with a view to preparing its returns on the installment-sales basis. It was advised that all the Government required was any bookkeeping system showing what the unrealized profits were. An analysis of its accounts was then made for the purpose of making such a showing. As a result of this analysis the unrealized profits on installment sales were eliminated from surplus account and credited to an unrealized profits account which was then set up. On August 8, 1919, the taxpayer filed returns showing its income computed on the basis of installment sales as reflected by the analysis and set-up referred to above. This return was accompanied by a letter of explanation to the Commissioner which contained also a request that the taxpayer be allowed the privilege of having its tax computed on the installment-sales basis in accordance with article 42 of Regulations 45. On September 13, 1919, the taxpayer filed a claim for abatement in the amount of the difference between the tax as shown by the original return (and paid) and the amount of the tax as shown by the return filed August 8, 1919. On September 12, 1921, a claim for credit was filed covering the same difference, to take the place of the claim for abatement theretofore filed.

10. On December 14, 1923, the Commissioner advised the taxpayer by letter that its claims would be rejected and that the Commissioner declined to accept the amended return filed August 8, 1919. His refusal to accept such amended return was based on office decision I. T. 1190 (7 C. B. 31). On the same day the Commissioner forwarded another letter to the taxpayer, advising it of a proposed additional assessment of tax for the year 1918 based on its original return of June 15, 1919, in the amount of $1,659.61, and advising the taxpayer of its right to appeal under the provisions of section 250 (d) of the Revenue Act of 1921. In response to the last-mentioned letter the taxpayer, on January 8, 1924, filed its appeal from such determination and at the same time filed a brief in which was set forth the income for 1918 as contended for by the taxpayer, computed on the installment sales basis. Accompanying this brief were data and other information in explanation of the taxpayer's contentions and purporting to show that the taxpayer's tax should be computed on the installment sales basis. After consideration of the taxpayer's appeal, the Commissioner determined that the taxpayer was not entitled to have its taxable income computed on the installment sales basis and again declined to accept the amended returns of the taxpayer prepared on that basis. He further denied

the appeal of the taxpayer relative to the proposed additional assessment of $1,659.61. The taxpayer was notified of such determination of the Commissioner by statutory registered letter dated September 15, 1924, from which the taxpayer appealed to this Board. Petition was filed November 12, 1924.

### DECISION.

The deficiency determined by the Commissioner for the year 1918 in the amount of $1,659.61 is approved.

### OPINION.

KORNER: The taxpayer filed a return of taxable income for the year 1918 computed on the basis of completed sales. On the basis of that return the Commissioner has determined a deficiency in tax in the amount of $1,659.61. The taxpayer does not deny that an audit of its return and books of account on the basis of completed sales properly discloses this deficiency. But the taxpayer does contend that its books of account were so kept as to entitle it to report its income on the installment-sales basis, in that from such books of account a complete system of installment-sales accountancy is susceptible of being evolved. In fact, since the filing of its original return, this taxpayer has, from such books of account, set up such a completed system. We are persuaded that the computations so made by the taxpayer correctly reflect the results obtained under the bookkeeping methods prescribed by article 42 of Regulations 45, as interpreted and modified by Treasury Decision 3082 and subsequent rulings of the Commissioner.

In its appeal the taxpayer asks this Board to require the Commissioner to adopt as a basis for its return of net income for 1918 a proposed amended return computed on the installment-sales plan of accountancy. This Board has recently held in the *Appeal of B. B. Todd, Inc.*, 1 B. T. A. 762, that it is without authority to require the Commissioner to permit the filing of returns and the computation of income and profits taxes, under the provisions of article 42 of Regulations 45, since such returns, if filed, would not " clearly reflect the income " of the taxpayer and the method of computing income provided in that article does not conform to section 200 of the Revenue Act of 1918. It is not necessary here to review extensively the reasoning in that opinion. However, certain portions thereof have pointed application to the facts in the instant appeal, as follows:

The Commissioner rejects the taxpayer's proffered returns upon the ground that it did not, during the years in question, keep its books upon the basis now required by the Commissioner of those permitted to return income upon the installment basis. But the taxpayer can, from the books kept, *compute* its income as accurately as if it regularly kept books upon the basis the Commissioner deems necessary. Income is a matter of fact—not of bookkeeping. The taxpayer is entitled to any *computation* of income made from the facts which is warranted by the Revenue Act of 1918.

The taxpayer comes to the Board appealing from a rejection of its proposed returns upon the installment basis, insisting that the Board should require the Commissioner to compute its deficiency in tax, if any, on that basis. We find no warrant in law so to do.

In accordance with the decision in the *Todd Appeal, supra*, the deficiency determined by the Commissioner for the year 1918 in the amount of $1,659.61 is approved.